IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **LETICIA CORONA,** and **ANGEL RIVERA**, individually and on behalf of their minor children, **J.H.**, **J.R.1**, **J.R.2**, **M.R.**, and **D.R.** <br><br> Plaintiffs, <br> vs. <br><br> **NORTH CENTRAL NARCOTICS TASK FORCE,** a legal entity; **BRENDAN F. KELLY**, Illinois State Police Director, in his Individual capacity; **JOHN DOE NORTH CENTRAL NARCOTICS TASK FORCE POLICE OFFICERS**; **JOHN DOE ILLINOIS STATE POLICE OFFICERS**; **INVESTIGATOR VARGAS,** Star Number 9503, an Illinois State Police Officer, **JORGE ROSILES,** a Village of Streamwood Police Officer; **OFFICER J. GOMEZ**, Star Number 3199, a Village of Streamwood Police Officer; **OFFICER C. CIACIURA**, Star Number 1412, a Village of Streamwood Police Officer; **OFFICER L. GOMEZ**, Star Number 3196, a Village of Streamwood Police Officer; **OFFICER C. JACOBS**, Star Number 4551, a Village of Streamwood Police Officer; **OFFICER D. O'SHEA**, Star Number 6668, a Village of Streamwood Police Officer; **JOHN DOE STREAMWOOD POLICE OFFICERS**; **VILLAGE OF STREAMWOOD**, a municipal corporation; **JOHN DOE BARTLETT POLICE OFFICERS**; **VILLAGE OF BARTLETT**, a municipal corporation; **JOHN DOE ELGIN POLICE OFFICERS**; **CITY OF ELGIN**, a municipal corporation; <br> Defendants. | **JURY DEMANDED** |

1

## COMPLAINT

Plaintiffs Angel Rivera and Leticia Corona, on their own behalf and on behalf of their minor children, J.H, J.R.1, J.R.2, M.R., D.R., by their attorneys of DVORAK LAW OFFICES, LLC, complain of Defendants as follows:

### JURISDICTION/VENUE

1. This incident occurred on or about March 22, 2023, in the Village of Streamwood, Cook County, Illinois.

2. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983, § 1988, the judicial code 28 U.S.C. § 1331, and § 1343(a); the Constitution of the United States, and pendent jurisdiction, as provided under 28 U.S.C. § 1367(a).

3. Venue is proper under 28 U.S.C. § 1391(b). On information and belief, the parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within the district.

### PARTIES

4. The Plaintiffs, Leticia Corona and Angel Rivera, at all times relevant to this Complaint, are residents of Streamwood, Cook County, Illinois, located in the Northern District of Illinois.

5. The Plaintiffs lived in a home in Streamwood with their five minor children.

6. All of the children are the biological children of Leticia Coronoa and Angel Rivera, except for J.H., who is not the biological son of Angel Rivera.

2

7. Angel Rivera brings this action on behalf of himself and also his minor biological children, J.R.1, J.R.2[1], M.R., and D.R.

8. Leticia Corona brings this action on behalf of herself and also her minor children, J.H., J.R.1, J.R.2, M.R., and D.R.

9. Defendant North Central Narcotics Task Force (hereinafter "NCNTF") is a "multi-county narcotics initiative linking local, county, and state police agencies in a partnership to pro-actively problem solve illicit drug trafficking in the counties of Cook, Kane, and McHenry," according to its Mission Statement.

10. The Illinois legislature created the Illinois Criminal Justice Information Authority ("ICJI") for various reasons, but one of them was to coordinate and implement federal funds for state and local law enforcement purposes.

11. The NCNTF was not one of the original drug units in existence at the time the ICJI was created, but instead it was created with the help of ICJI.

12. Defendant NCNTF is – or can be considered analogous to – a Multi-jurisdictional Drug Enforcement program.

13. Upon information and belief, Defendant NCNTF is funded by the federal government, with matching local funds, but does not receive state funding.

14. Upon information and belief, although NCFNTF's Director is the Illinois State Police Director, other representatives from local jurisdictions are also members of the organizational chart, as are civilian employees of the

---

[1] The two J.R. children not only have the same two initials, but the same middle initial as well, so they are referred to in this numerical manner.

NCNFT, an entity that is separate and distinct from the Illinois State Police and/or the State of Illinois.

15. NCNTF is not subject exclusively to Illinois State Police control.

16. The powers of the NCFNT is not co-extensive with the State of Illinois and/or the Illinois State Police.

17. Additionally, Defendant NCFNT is not authorized to exercise all the powers of the State of Illinois and/or the Illinois State Police.

18. In short, NCNTF is a government entity that is distinct from the State of Illinois and/or the Illinois State Police, and thus is a suable entity, pursuant to Section 1983.

19. NCNTF is being sued based on its own actions or inactions for the state claims of willful and wanton failure to properly hire, supervise, retain and/or train its employees and/or agents and/or apparent agents; based on *respondeat superior* principles for the state claims based on the actions of its agents, apparent agents, and/or employee police officers, and for *Monell* purposes.

20. For the actions described that form the basis of the *Monell* claim, NCNTF was at all times acting under color of law.

21. Defendant Illinois State Police Director Brian F. Kelly is sued in his individual capacity, who at all times was acting under color of law and within the course and scope of his duties and employment.

22. Upon information and belief, Defendant Kelly is on the top of NCNTF's organizational chart, but this chart also includes employees of NCNTF as a

separate entity, as well as representatives from various local police departments.

23. Although the Plaintiff contends that NCNFT is a separate suable entity, additionally and/or alternatively, Defendant Kelly has sufficient power and control over the powers, policies, hiring, retention and training of its law enforcement officers that he has the duty and ability to ensure that law enforcement officers employed, contracted with and/or are in partnership with NCNFT be properly hired, retained, trained and supervised to avoid violating the constitutional rights of individuals such as the Plaintiffs, and to also ensure that they are not subject to acts of assault, false imprisonment and intentional infliction of emotional distress.

24. Defendant Kelly is being sued in his individual capacity for the Section 1983 claims stated in this case, based on supervisory liability, and in taking these actions he was acting under color of law, and in the course of his employment and/or agency and/or apparent agency with the Illinois State Police and/or the NCNTF.

25. Defendant Investigator Vargas, Defendant John Doe ISP Officers, and Defendant John Doe NCNTF Police Officers, at all times relevant to this Complaint, were acting under color of law, and in the course and scope of their employment and/or agency and/or apparent agency with the Illinois State Police and/or NCNTF.

26. Defendant Officers J. Rosiles, J. Gomez, C. Ciaciura, L. Gomez, C. Jacobs, D. O'Shea, and John Doe Streamwood Police Officers were acting under color of law, and in the course and scope of their employment and/or agency

5

and/or apparent agency with the Village of Streamwood and/or NCNTF, and/or Illinois State Police.

27. Defendant Village of Streamwood is a municipal corporation and, at all times relevant to this Complaint, was the principal employer and/or shared employer of Defendant Officer J. Rosiles, Defendant Officer J. Gomez, Defendant Officer C. Ciaciura, Defendant Officer L. Gomez, Defendant Officer C. Jacobs, Defendant Officer D. O'Shea, and John Doe Streamwood Police Officers.

28. Defendant John Doe Bartlett Police Officers were acting under color of law, and in the course and scope of their employment and/or agency and/or apparent agency with the Village of Bartlett, Illinois State Police and/or NCNTF.

29. Defendant Village of Bartlett is a municipal corporation and, at all times relevant to this Complaint, was the principal employer and/or shared employer of John Doe Bartlett Police Officers.

30. Defendant John Doe Elgin Police Officers were acting under color of law, and in the course and scope of their employment and/or agency and/or apparent agency with the Village of Eglin, Illinois State Police and/or NCNTF.

31. Defendant City of Elgin is a municipal corporation and, at all times relevant to this Complaint, was the principal employer and/or shared employer of John Doe Elgin Police Officers.

32. Unless otherwise specified, when referring collectively to "Defendant Officers," named Defendant Officers, John Doe Streamwood Police Officers,

6

John Doe Bartlett Police Officers, John Doe Elgin Police Officers, John Doe ISP Officers, and John Doe NCNTF Officers are included in this description. This description does not include Defendant Kelly, whose actions or inactions are separately described in this complaint.

## FACTS

33. In the early morning hours of March 22, 2023, Leticia Corona, Angel Rivera, and their five minor children, who were 10, 8, 7, 5, and 4 years old at the time, were at their Streamwood home, and were all sleeping.

34. March 22, 2023, was a school day, so the children planned to go to school later that day and Leticia Corona and Angel Rivera planned to help them get ready and take them to school.

35. Upon information and belief, as the Plaintiffs and the children slept, over 20 law enforcement officers consisting of the Defendant Officers, arrived at 1082 Bristol Court, in Streamwood, Illinois, to execute a search warrant, looking for drugs alleged to be in the possession of Plaintiff Angel Rivera.

36. Plaintiffs deny Angel Rivera had any involvement in drug use that would have served as a valid basis for the issuance of a search warrant, and no drugs or other contraband were found in his home as a result of the unjustified raid.

37. During this time, the Plaintiffs and their minor children resided in the upstairs portion of the Streamwood residence, while an individual by the

name of Matthew, who was not related to the Plaintiffs, rented and resided in the basement level unit of the residence.[2]

38. At approximately 5:30 a.m., the Plaintiffs and their minor children awoke to what sounded like a loud bus in the back area of the house, strobe lights coming from outside into the bedroom where four of the Plaintiffs' minor children slept, and spotlights through the Plaintiffs' bedroom and front windows of the house, where J.H., then only ten years old, slept on the living room couch.

39. Angel Rivera looked out of the window of the residence where he saw Defendant Officers pointing firearms at the house and announcing over a bullhorn for "residents of 1082 Bristol Court" to exit the house.

40. Various police vehicles surrounded the home, including the Elgin Police Department K-9 unit.

41. In addition to various police vehicles, the Plaintiffs' home was surrounded by two armored military vehicles with a battering ram pole attached.

42. One military vehicle was in the front of the Plaintiffs' home, while another military vehicle was located in the back of the Plaintiffs' home.

43. The Defendant Officers at first tried to forcibly attempt to gain entry into the home, which were unsuccessful.

44. Angel Rivera then opened the front door of his home to a team of six or seven Defendant Officers at the door.

---

[2] The Plaintiffs know the full name of this person, but choose only to identify him by his first name in this Complaint.

45. The Officers were in full military gear, carried ballistic shields, and carried assault-style weapons.

46. Some of the Defendant Officers wore ski masks, unnecessarily adding to the intimidating nature of the raid.

47. At least three Defendant Officers pointed a weapon with an activated laser attachment, aimed individually at Angel Rivera, Leticia Corona, and J.H., who had been in the living room.

48. Leticia Corona gathered the children and the Plaintiffs' other children were now also downstairs.

49. Although J.H. was the oldest of the five children, it would have been obvious to anyone viewing J.H. that he was a young minor who posed no danger to the heavily armed and numerous fully equipped police officers.

50. While Angel Rivera opened the door, M.R., who was only 5 years old at the time, was also visible to the Defendant Officers.

51. In addition, Angel Rivera announced to Defendant Officers that his children were present and/or that there were children in the house.

52. With assault-style weapons pointed at Angel Rivera, Leticia Corona, and all their minor children, Defendant Officers ordered Angel Rivera to exit the home.

53. Leticia Corona and the minor children were then ordered to follow, exiting the home.

54. Angel Rivera and Leticia Corona wore only a bath robe, and their minor children had on only thin pajama clothing or T-shirts.

55. The Plaintiffs and their minor children had no shoes or socks on.

9

56. The Plaintiffs and their minor children were not allowed to put on coats, additional clothing, shoes, or socks on before being ordered outside.

57. It was cold outside, perhaps in the 30s or low 40s at the time, and snow had accumulated on the ground.

58. Although both Angel Rivera and Leticia Corona repeatedly asked the Defendant Officers what was going on, Defendant Officers either ignored their questions or indicated that they could not say anything about what was going on.

59. While continuing to point their guns at Angel Rivera, Leticia Corona, and the minor children, Defendant Officers separated Angel Rivera from Leticia Corona and the children.

60. Defendant Officers placed Angel Rivera into zip-tie handcuffs.

61. Defendant Officers continued to point their assault weapons at Angel Rivera, Leticia Corona, and their five minor children in an extremely aggressive and unreasonable manner throughout the time that they were ordered outside and placed into separate vehicles.

62. The Plaintiffs and their minor children complied with the officers' commands.

63. Despite being on notice that all of the children were ten years old or younger (both during the extraction and immediately thereafter through their own further observations), the Defendant Officers who participated in the raid continued to point their weapons at all of the Plaintiffs, including the children.

64. All of these Defendant Officers were also aware that the Plaintiffs were extremely cold and emotionally traumatized, and yet took actions to exacerbate their extreme discomfort and anxiety by refusing to allow them to be properly dressed for the weather and in continuing to take aggressive actions toward the Plaintiffs, including the pointing of assault weapons at the Plaintiffs, including their five minor children.

65. Initially, Defendant Officers started to place Angel Rivera into the back of a military-style police vehicle, which, upon information and belief, contained no windows from which Angel Rivera would be able to see outside.

66. However, immediately prior to being placed into the windowless military-style vehicle, a Defendant Officer ordered Angel Rivera instead to be placed into a detective's squad car, which contained windows.

67. Angel Rivera then watched from the squad car as Defendant Officers placed Leticia Corona and the five children into the back of a windowless, unmarked, white utility or cargo-style van.

68. Angel Rivera repeatedly asked Defendant Officers what was going on and was either ignored or told "not to worry about it."

69. Eventually, Angel Rivera was told that Defendant Investigator Vargas would speak with Angel Rivera once they were finished executing searching the house.

70. Angel Rivera, Leticia Corona and the children were not armed or reasonably believed to be armed.

71. Angel Rivera, Leticia Corona and the five children were not engaging, nor had they engaged, in any violation of any local, state, or federal criminal

11

statute or ordinance, nor was there probable cause for any officer to believe so.

72. Upon information and belief, Letecia Coronoa and her five children were not alleged by an informant or in any police document to have engaged in any criminal activity.

73. Angel Rivera asked to see the search warrant, and Defendant Officers refused to show Angel Rivera the search warrant.

74. The back of the windowless utility van where Defendant Officers placed Leticia Corona and her five children contained no lights, and was pitch black.

75. Letecia Corona and her five children were extremely frightened, extremely cold, and crying as they sat in the back of the pitch-black van.

76. One Defendant Officer was seated in the drivers' seat and another Defendant Officer was seated in the passenger seat of the windowless van where Leticia Corona and the children were placed.

77. Separating the front area of the van and the back area of the van was a black curtain, preventing Leticia Corona and the children from seeing the officers, the front area of the van, or out of the front windows of the van.

78. While Leticia Corona and the children were in the back of the windowless van, the Defendant Officers asked Leticia Corona questions about who lived in the house. Leticia answered that she lives there with her family and that there were also people living in the unit downstairs.

12

79. After approximately five minutes, Defendant Officers began to drive Leticia and the children around in the windowless van, seemingly aimlessly, without any explanation as to where they were going or what was going on.

80. While Leticia Corona and the children were in the back of the van, the children continued to cry and ask, "where's Pappy," referring to their father, Angel Rivera.

81. While Leticia Corona and the children were in the back of the van, Leticia felt physically ill and informed the Defendant Officers that she was going to be sick and needed the Defendant Officers to release her and the children from the van.

82. Leticia Corona and the children were all locked in the windowless van, driven around, and transported against their will and without freedom of movement.

83. The Defendant Officers who drove the van, and any further officers who knew and/or authorized these actions, including but not limited to Defendant Vargas, who appeared to be the person in charge of the operation, knew they were illegally detaining Letecia Coronoa and her five children, and they knew they were causing them severe emotional distress, yet these officers continued to engaging in these outrageous actions, and/or they failed to intervene to prevent this from occurring, and/or any supervisor, including Defendant Vargas, turned a blind eye to such outrageous actions.

84. Meanwhile, Angel Rivera was placed into a different vehicle, zip-tied, and separated from his family.

13

85. Defendant Officers offered no explanation to Angel Rivera as to where they were taking Leticia Corona and the five children.

86. One Defendant Officer, who told Angel Rivera that his name was "Tony," began asking Angel Rivera questions about what types of illicit items police would recover from the home. Angel Rivera denied that there were any illegal items in the home.

87. Defendant Officer "Tony" told Angel Rivera that the police recovered a gun in the home and asked Angel questions about weapons in the home. Angel Rivera denied that he had any guns in the home.

88. The raid continued for approximately three hours, an unnecessarily long and unreasonable amount of time.

89. Angel Rivera was kept in zip ties during most of the three-hour raid, which was unreasonable and unnecessary.

90. The Defendant Officers drove Leticia Corona and the children away from the home and kept them in the windowless van for approximately one or two hours of the three-hour raid, during which time Leticia repeatedly indicated that she was going to be sick and asked to be released so she and the children could at least use the bathroom.

91. Defendant Officers eventually released Leticia and the children to use the bathroom.

92. After the raid concluded, Defendant Officer "Tony" informed Angel Rivera that Matthew, the downstairs neighbor, and Matthew's guest, were going to jail.

14

93. Upon information and belief, after the raid concluded, Matthew and his guest were taken into custody by police and held for several hours before being released without charges.

94. Upon information and belief, no one was charged with any crime in relation to the raid of the Plaintiffs' home.

95. Defendant Officers failed to find any evidence of illegal contraband in the home, and neither Angel Rivera nor Letecia Coronoa charged with any crime.

96. After the conclusion of the raid, Defendant Officers and Defendant Investigator Vargas released the Plaintiffs and began to leave to the area. Angel Rivera asked again to see the search warrant.

97. Finally, Defendant Vargas apprehensively gave a copy of the search warrant to Angel Rivera, which was issued on March 21, 2023, at 2:09 p.m., subscribed and sworn by Defendant Investigator Vargas before a Judge in Cook County, Illinois.

98. The continuous pointing of weapons was unnecessary and thus unreasonable, as the Plaintiffs posed no danger to the officers, but the manner and extended period of time in which these Defendants detained the Plaintiffs and/or pointed their weapons at the Plaintiffs was further unreasonable, especially considering the fact that they continued to point their weapons at the children even though they knew these were young minors.

99. The Plaintiffs' home was completely ransacked and severely damaged in the course of the search, including a shattered back window, broken back door,

and holes in the bathroom and living room walls. This was unreasonable and unnecessary.

100. The Plaintiffs' family dog became depressed and sick after the raid, and died three weeks later, upon information and belief as the proximate result of the raid on the Plaintiff's home.

101. Throughout the extraction and search of the home, Defendant Officers pointed guns and yelled at the Plaintiffs and their minor children, and knowingly put them in extremely traumatizing conditions, causing all of them extreme and permanent stress, anxiety and depression.

102. Leticia Corona and the children were placed in a windowless vehicle, driven around, were obviously freezing and traumatized, and were not free to leave.

103. Defendant Officers knew that Leticia Corona and the minor children were being subjected to excessive force and illegal seizure, yet they failed to intervene to prevent each other from doing this, even though each of them had a reasonable opportunity to do so.

104. As a result of the malicious, extreme and outrageous actions and inactions of the Defendant Officers, the Plaintiffs have suffered severe emotional damage.

105. The event had an especially traumatic effect on M.R. and D.R., the youngest of the five children, who now experience PTSD symptoms, developed learning disabilities, struggle to focus in school, and struggle to sleep at night out of fear that police officers will come to the house again.

106. As a result of the Defendants' actions on March 22, 2023, the Plaintiffs suffered personal and pecuniary injuries including, but not limited to, loss of freedom, humiliation, and severe emotional distress.

107. The Plaintiffs bring a *Monell* claim against NCNTF.

108. For at least 10 years prior to the incident date, upon information and belief, NCNTF had no affirmative, official policy or training for its officers regarding: (a) how to properly handle children and youth with due care during the execution of search warrants; (b) when it is appropriate to draw and point firearms at civilians, including but not limited to children and youth; (c) the critical importance of refraining from pointing firearms at children and youth so as not to traumatize them; and how to handle children and non-targets of search warrants in a safe and non-traumatizing manner and in a way not to unlawfully seize them and restrain their physical movement.

109. In the alternative, NCNTF affirmatively trained its officers that they were permitted to falsely seize non-targets of a search warrant and point firearms at all civilians, including children and youth, when executing search warrants, and/or NCNTF officers had a widespread practice and *de facto* policy of pointing their firearms at civilians, including children, during the execution of search warrants, even fully compliant civilians posing no threat to officer safety, such as young children.

110. The Plaintiffs bring Illinois state law claims for intentional and/or willful and wanton infliction of emotional distress, assault, and false imprisonment against all Defendant Officers, and against their employers,

agents and/or apparent agents, as described in this complaint, based on a *respondeat superior* theory of liability.

111. The Plaintiffs also bring against Defendants Kelly and Vargas a willful and wanton failure to properly hire, train, supervise, and retain employees and/or other officers under his/their control.

112. The Plaintiffs bring against Defendant Officers Section 1983 claims of excessive use of force and illegal seizure based on the lack of basis for any use of force or illegal seizure but also based on the manner in which those constitutional violations occurred, in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

113. At this time, the Plaintiffs do not bring an illegal search of the home claim, based on insufficient information, however, the Plaintiffs do bring against the Defendant Officers an illegal search claim related to the manner and duration of the search of the Plaintiffs' home.

114. The Plaintiffs also bring a failure to intervene claim against the Defendant Officers for failure to prevent the above constitutional violations, even though each of these individuals had a reasonable opportunity to prevent such constitutional violations, as well as supervisory liability against Defendants Vargas and Kelly.

115. Defendant Village of Streamwood is a municipal corporation located in Cook County, Illinois, and is being sued for indemnification purposes for the actions of Defendant Officer J. Rosiles, Defendant Officer J. Gomez, Defendant Officer C. Ciaciura, Defendant Officer L. Gomez, Defendant

Officer C. Jacobs. Defendant Officer D. O'Shea, and Defendant John Doe Streamwood Police Officers.

116. Defendant Village of Bartlett is a municipal corporation located in Lake County, Illinois, and is being sued for indemnification purposes for the actions of Defendant John Doe Bartlett Police Officers.

117. Defendant City of Elgin is a municipal corporation located in Lake County, Illinois, and is being sued for indemnification purposes for the actions of Defendant John Doe Elgin Police Officers.

WHEREFORE, Plaintiffs Angel Rivera and Leticia Corona, on their own behalf and on behalf of their minor children, J.H, J.R.1, J.R.2, M.R., D.R., respectfully request that this Court enter a judgment in their favor against the Defendants and other as-yet-unidentified officers, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief this Court deems just and appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

                              Respectfully Submitted,

                              /s/ Richard Dvorak

                              Richard Dvorak,
                              One of the Attorneys for the
                              Plaintiffs

Richard Dvorak
DVORAK LAW OFFICES, LLC
1 Walker Avenue, Suite 204
Clarendon Hills, IL 60514
(630) 590-9158
richard.dvorak@civilrightsdefenders.com